IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

```
BARBARA R. RUSK,                )
                                )
        Plaintiff,              )
                                )
v.                              )      CASE NO. CV418-211
                                )
SPECIALIZED LOAN SERVICING, LLC, )
                                )
        Defendant.              )
_____)
```

## O R D E R

Before the Court is Defendant Specialized Loan Servicing, LLC's ("SLS") Motion for Summary Judgment. (Doc. 37.) For the following reasons, Defendant SLS's motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

### I.   THE LOAN AND LOAN DOCUMENTS

Plaintiff took a mortgage loan out on her two-unit Savannah townhome (the "Property") with SunTrust Mortgage, Inc. ("SunTrust") in 2009.[1] (Doc. 37, Attach. 2 at ¶ 1.) SunTrust subsequently transferred the servicing duties on the mortgage to Defendant SLS on June 16, 2017. (Doc. 39, Attach. 1 at ¶ 1.) At the time of the transfer, Plaintiff was not living in the Property,

---

[1] As it must at this stage, the Court construes the facts in the light most favorable to Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

but instead was living in New Mexico. (Doc. 37, Attach. 4 at 10-
12.) By letter dated May 31, 2017, SunTrust informed Plaintiff
that the servicing of her mortgage loan was being transferred
effective June 16, 2017 to Defendant SLS. (Doc. 37, Attach. 4 at
40.) The letter informed Plaintiff that borrower correspondence
should be mailed to P.O. Box 636005, Littleton, CO 80163-6005 and
that after the service transfer date, all Qualified Written
Requests ("QWR"), Notices of Error ("NOE"), and Requests for
Information ("RFI") should be sent to "Specialized Loan Servicing
LLC, ATTN: QWR/NOE/RFI, P.O. Box 636005, Littleton, CO 80163-
6005." (Id. at 40-41.)

By letter dated June 22, 2017, Defendant SLS informed
Plaintiff that her mortgage on the Property was in default "as a
result of [her] failure to pay the 05/01/17 payment and the
payments due each month thereafter, as provided for in said Note."
(Id. at 36.) The letter informed Plaintiff that the amount required
to cure the arrears was $2,799.16. (Id.) The letter also stated
under a heading titled "[i]n accordance with the Fair Debt
Collection Practices Act, you are hereby given notice of the
following" that

> [u]nless within 30 days after you receive this notice
> you dispute the validity of the debt or a portion
> thereof, the debt will be assumed to be valid. If you
> notify us in writing within 30 days after you receive
> this notice that you dispute the debt or a portion
> thereof, we will obtain and mail to you verification of
> the debt.

2

(Id. at 37.) In a separate letter dated June 22, 2017, Defendant SLS informed Plaintiff that the servicing of her loan had been transferred to it. (Doc. 39, Attach. 2 at 181-190; Doc. 37, Attach. 3 at 85-94.) Included in the letter was a Real Estate Settlement Procedures Act ("RESPA") notice that informed Plaintiff that a qualified written request must be sent to "Specialized Loan Servicing, LLC, P.O. Box 630147, Littleton, CO 80163-0147." (Doc. 39, Attach. 2 at 187; Doc. 37, Attach. 3 at 91.)

Suspecting an error, Plaintiff called SLS's customer service department on July 3, 2017 and explained that she believed the prior servicer, SunTrust, misapplied one of her payments and that the delinquency was therefore in error. (Doc. 39, Attach. 3 at 0:00-2:00; 21:00-22:50.) During that phone call, SLS's customer service representative informed Plaintiff that Defendant SLS would investigate her claim and she would receive follow-up letters from SLS regarding the results of the investigation and any actions taken. (Id. at 38:19-39:12.) The customer service representative did not inform Plaintiff that she was required to submit a written dispute. (Doc. 39, Attach. 3.) Plaintiff did not communicate her dispute to SLS in writing at that time. (Doc. 39 at 20; Doc. 29, Attach. 2 at 165.) Plaintiff attempted to make a payment to SunTrust on June 29, 2017 through her bank, Wells Fargo, however, that payment was returned. (Doc. 37, Attach. 4 at 17.) Plaintiff

3

made her first payment to Defendant SLS on her mortgage loan on August 25, 2017. (Id.)

Also on August 25, 2017, Plaintiff visited the Property for the first time since June 2016 and realized that the locks had been changed and that she could not access the Property.[2] (Doc. 39, Attach. 5 at 46.) As discussed below, there was a sticker affixed to her door by ServiceLink that stated "[a]n Independent Field Inspector called on you today. Please contact your mortgage provider." (Doc. 37, Attach. 4 at 51; Doc. 37, Attach. 2 at ¶ 30.) Plaintiff subsequently retained counsel, Larry Evans, who called Defendant SLS on November 30, 2017, and requested access to the Property and requested the payment history for Plaintiff's loan. (Doc. 39, Attach. 2 at 22.)

Plaintiff received mortgage loan statements in June, July, August, September, October, and November, and December 2017 that indicated that Plaintiff was past due on her account. (Doc. 37, Attach. 3 at 51-62; 95-96.) These statements also listed the address to send NOEs and RFIs (including Qualified Written Requests) as "P.O. Box 630147, Littleton, CO 80163-0147." (Id.) On December 7, 2017, Plaintiff's counsel, Larry Evans, sent a letter to Defendant SLS at P.O. Box 636005, Littleton, Colorado 80163 and

---

[2] Because the parties vigorously dispute the facts surrounding the purported lock out of Plaintiff from the Property, the Court finds it necessary to have a separate fact section for the lock change.

4

demanded that Defendant SLS sent a copy of the keys to the Property to him and also requested a complete ledger detailing the amounts that Defendant SLS contends Plaintiff owes as well as all payments received from Plaintiff. (Doc. 39, Attach. 2 at 165-67.)

By letter dated December 11, 2017, Defendant SLS responded and stated that they received a letter but "not at our designated address for such inquiries." (Id. at 168.) Further, Defendant SLS stated that QWRs needed to be submitted in writing to P.O. Box 630147, Littleton, CO 80183. (Id.) However, Defendant SLS did state that Plaintiff's case was currently under review. (Id.) Larry Evans called Defendant SLS on December 19, 2017 and was informed by Defendant SLS that it would need to review SunTrust's records to determine if there had been an error. (Doc. 39, Attach. 7 at 36:40-37:20.) Larry Evans was also told that a set of keys to the Property would be mailed to him to restore Plaintiff's access to the Property. (Doc. 39, Attach. 8 at 0:45-59.)

Having received no written response to his earlier letter, Larry Evans sent another letter dated December 20, 2017 to Defendant SLS at the address of P.O. Box 636005, Littleton, CO 80163. (Doc. 39, Attach. 2 at 225.) Evans stated in the letter that he spoke with "Flor" in the customer service department and was told that it was possible that SunTrust "transferred the loan to SLS with a reported delinquent status premised, purportedly, on Ms. Rusk's failure to make timely payments for April, May and June,

5

2017." (Id.) Evans again asserted that Plaintiff contests the balance owed and stated that the discrepancy appears to be a result of SunTrust's failure to credit her payments and attached the Payment History detailing her payments for April, May, and June 2017. (Id.) Evans stated that "it seems apparent that SunTrust and SLS have failed to credit Ms. Rush for a total of \$6,974.40 in payments." (Id. at 226.)

By letter dated January 5, 2018, Defendant SLS responded to the letters dated December 7 and 20, 2017. (Doc. 39, Attach. 2 at 178.) The letter informed Evans that Plaintiff's account was currently due for the July 1, 2017 payment in the amount of \$2,432.56 and attached the Notice of Servicing Transfer, Billing Statement, Transaction Codes, Payment History, Deed of Trust, and Note. (Id.) The letter stated that Plaintiff's dispute references issues with her prior servicer and that "SLS does not have records pertaining to that time frame and SLS did not conduct the transactions your client mentions" and that Defendant SLS "approved internally" a request to mail the keys to the new locks and that the keys should arrive on or around December 22, 2017. (Id. at 179.)

## II. THE LOCK CHANGE

ServiceLink Field Services ("ServiceLink" or "SLFS") first inspected the Property on July 5, 2017 and reported that the

6

Property was occupied and in good condition.[3] (Doc. 39, Attach. 2 at 76:16-24, 133.) Additionally, under the recommended services box, maintenance or resecuring was not recommended. (Id. at 133.) On August 17, 2017, Defendant SLS requested that an inspection be performed (Doc. 39, Attach. 2 at 78:18-19; 142) and the inspection was performed on August 25, 2017 (Doc. 39, Attach. 2 at 77:13-19, 137). The August 25, 2017 property inspection reported the Property as vacant and under the recommended services box answered "yes" to the items "is maintenance or resecuring recommended" and "change locks." (Doc. 39, Attach. 2 at 137.) Defendant SLS's records reflect that it received the August 25, 2017 property inspection report on August 28, 2017. (Id. at 144.)

On August 25, 2017, Plaintiff visited the Property for the first time since June 2016 and realized that the locks had been changed and that she could not access the Property. (Doc. 39, Attach. 5 at 46.) There was a sticker affixed to her door by ServiceLink that stated "[a]n Independent Field Inspector called on you today. Please contact your mortgage provider." (Doc. 37, Attach. 4 at 51; Doc. 37, Attach. 2 at ¶ 30.) Plaintiff called the number provided on the sticker and spoke with a representative of Defendant SLS who told her that Property Preservation would call

_____

[3] Because the deposition is multi-page, the Court refers to the page of the deposition when citing to the deposition itself, but to the page assigned by the Court's ECF software when citing to the exhibits attached to the deposition.

7

her about being locked out. (Doc. 39, Attach. 1 at ¶ 16; Doc. 37, Attach. 2 at ¶ 30-32.) Plaintiff was told that she had to wait for Property Preservation to call her and that she could not be given their number. (Doc. 39, Attach. 1 at ¶ 17; Doc. 39, Attach. 6 at 1:40-45, 4:25.) Plaintiff maintains that no one from Property Preservation called her. (Doc. 39, Attach. 1 at ¶ 18.)

On August 25, 2017, Matthew Stewart, an employee of Defendant SLS, e-mailed #NA SLS PropPres that "[w]e need to have borrower regain access to house immediately . . . [s]he came back to have locks changed and is at the residence now waiting for someone to show up with keys."[4] (Doc. 39, Attach. 2 at 87.) In response, #NA PropPres responded and stated that "[w]e have only completed one inspection and it was reported occupied. We have not secured this property." (Id.)

As stated above, Defendant SLS received the August 25, 2017 property inspection report on August 28, 2017. (Id. at 144.) In an entry in Defendant's internal records dated August 29, 2017, created by Teller ID number 20190, a message states "009 STANDARD-Property is reported Vacant/Secure and in active loss mitigation, requesting approval to change locks and cut grass to avoid violations." (Id. at 143-144.) In another entry, dated the same day by Teller ID Number 2333, it is reported "009 DONE 8/29/17 BY

---

[4] "#NA SLS PropPres" is a monitored e-mail box for Defendant SLS's Property Preservation department. (Doc. 39, Attach. 2 at 15.)

8

TLR 02333" and "009- 8/29/17-Notified [ServiceLink] to proceed as normal with preservation if property is vacant . . . ." (Id. at 144.)

Also, on August 29, 2017, there is an entry by Teller ID Number 20190, that states ". . . OPENED CIT 202 FOR PERMISSION TO SECURE AND CUT GRASS; SET FOLLOW UP." (Id. at 145.) Subsequently, on August 31, 2017, there is an entry by Teller ID Number 21328 that states "ServiceLink-Per SLS CIT 202 report Created order 104167099 to perform initial grass cut. Loan is not in Loss Mitigation. Gilbert SL." (Id.) ServiceLink performed another inspection on September 19, 2017 and Defendant SLS received that report on September 29, 2017. (Doc. 39, Attach. 2 at 138, 145.) The document from ServiceLink has the same order number, 104167099, as included in Defendant SLS's documents but does not include details about the work performed. (Id. at 138.)

An entry dated November 22, 2017, by Teller ID Number 20190, states that "SERVICELINK (JL)-REVIEWED FOLLOW UP QUEUE; ACTIVE LOSS MITIGATION; FIRST TIME VACANT 8/25/17; PROPERTY REPORTED OCCUPIED 9/28/17; NO RECENT INSPECTION WITHIN LAST 45 DAYS; CANCELLED LOAN WORK; NO OTHER ACTIONS TAKEN." (Id. at 146.) As stated above, Larry Evans called Defendant SLS on November 30, 2017, and was told that Property Preservation would call him about access to the Property, however, he did not receive a return call. (Id. at 22.)

9

There are entries on Defendant's internal transaction log on November 30, 2017 and December 15, 2017 wherein the message states that Larry Evans contacted Defendant SLS and was reporting that the borrower, Plaintiff, was locked out of the Property. (Id. at 147, 148.)  Also on November 30, 2017, Kim Riggs, a Loss Mitigation Specialist with Defendant SLS, e-mailed #NA SLS PropPres asking for Larry Evans to be contacted "about removing lockbox of property so bor has access to the home."  (Id. at 176.)

#NA SLS PropPres responded to Riggs on December 7, 2017 that the Property had not been secured to date and, therefore, they were unable to provide access without first securing. (Id.) On December 19, 2017, Riggs forwarded the above exchange to Flor Villegas-Heras and Villegas-Heras e-mailed #NA SLS PropPres on the same date stating:

> The atp is stating the property was secured with locks in august and his client has been calling and sending requests to try to obtain the keys with no success. Below is an email that another agent sent to prop press requesting the keys and prop press responded stating they did not secure the property. But the atp Is stating when the locks were placed we left a note stating please contact your mortgage company in which is us SLS. Can we please get this escalated as the atp sent a written dispute due to the fact that we have not gotten this resolved for the bor despite their continued requests to get this resolved.

(Id. at 175.) #NA SLS PropPres responded the same day, December 19, 2017, and stated that ServiceLink "has been notified to mail

10

a set of keys to the ATP Larry Evans." (Id. at 174.) In a subsequent e-mail, #NA SLS PropPres stated that the keys should be sent overnight and gave an estimated delivery date of the keys of no later than Thursday, December 21, 2017. (Id.) An entry dated on December 19, 2017 in Defendant SLS's internal transaction log states "12/19/17-Approved SLFS $10.00 to mail keys to ATP Larry Evans." (Doc. 39, Attach. 2 at 148.)

In a separate chain of e-mails on December 19, 2017, #NA SLS PropPres responded to an e-mail from Gilbert Valdez at ServiceLink and authorized ServiceLink to send the keys to Larry Evans and approved the cost of $10.00. (Id. at 170.) The next day, however, Gilbert Valdez responded and stated that "[t]his loan is cancelled and this is a Georgia property. I also show that SLFS has never secured this property. We do not have a key to send out." (Id.) An entry on Defendant SLS's internal transaction log dated December 20, 2017 states that Evans was advised that he would get keys within the next couple of days. (Id. at 149.)

On December 29, 2017, #NA SLS PropPres e-mailed Villegas—Heras and Kevin Tatum and informed them that ServiceLink "reports they never secured this property so they are unable to send a key to the borrower or their counsel." (Id. at 173.) In response, Tatum e-mailed and asked what must be done to secure the Property and "if we have our lockbox on and changed the locks, is it secure at this time? What further needs to be done on our end. . . ." (Id.)

11

#NA SLS PropPres responded to Tatum's questions by e-mail dated
December 29, 2017 and stated that

> [i]n order to secure this property we need approval from
> the borrower or their approved representatives. The
> property is located in GA which is a personal property
> state so we do not secure by changing the locks. If the
> property is unsecure at the time of inspection-we secure
> with existing hardware. If we receive approval to, we
> can have SLFS secure the property and then overnight the
> keys to the borrower or ATP.

(Id. at 172-73.)

A January 5, 2018 internal transaction log entry states that
Evans had called to state that he had not been contacted by
Property Preservation to gain access to the Property. (Id. at 150.)
Another entry dated the same day states "REQUEST VIA EMAIL TO THE
PROPERTY PRESERVATION DEPT FOR THE ATP FOR CONTACT TO GAIN ACCESS."
(Id.) A letter dated January 5, 2018 was mailed to Larry Evans
from Defendant SLS in which Defendant SLS represented "[o]n
December 19, 2017, a request was approved internally to mail the
keys for the new locks to you . . . [t]he keys should arrive on or
around December 22, 2017." (Doc. 39, Attach. 2 at 179.) Another
transaction log entry dated January 12, 2018 states that Evans
called to see why he had not been given the keys to access to the
Property. (Id.) An entry dated January 9, 2018 states "012 Closed
571 as Servicelink has never secured this property and loan is
cancelled." (Id. at 150.)

On January 17, 2018, an entry states that Evans had called and complained that he had not received keys to access the Property and that Evans was transferred to Property Preservation "for update on key situation." (Id. at 151.) On January 18, 2018, an entry was created by Teller ID 2333, that states: "014 **RUSH REQUEST** Provide access to: Larry Evans . . . Special Instructions: Please secure property and provide access to the ATP." (Id.) An entry dated January 19, 2018, by Teller ID Number 21328, reads "014 ServiceLink Created Rush Order #105379097. Please secure with existing. Please set up a meet and greet contact Larry Evans." (Id. at 151-52.) Another entry dated January 24, 2018 reads "014 ServiceLink Created Rush Order #105403959. Please secure with existing. Please set up a meet and greet contact Larry Evans . . . ." (Id. at 152.) On January 30, 2018, an entry states that "014 Closed CIT 571 keys were provided to attorney Larry Evans on 1/29/18." (Id. at 154.)

III.   PLAINTIFF'S INITIATION OF SUIT

On July 26, 2018, Plaintiff filed suit in the State Court of Chatham County alleging that Defendant SLS violated the Fair Debt Collection Practices Act ("FDCPA"), to wit 15 U.S.C. § 1692(f) by attempting to collect amounts of money not authorized by agreement and taking nonjudicial action to affect dispossession and disablement of the Property and 15 U.S.C. § 1692e by communicating to credit reporting agencies credit information concerning

13

Plaintiff that Defendant knew to be false at the time of reporting. (Doc. 1, Attach. 2 at 7-8.) Plaintiff also included state law claims for trespass to land, negligence, interference with enjoyment, conversion/deprivation of personal property, trespass to personalty, and attorneys' fees. (Id. at 8-12.) On September 5, 2018, Defendant SLS removed the case to this Court. (Doc. 1.) On May 6, 2019, Plaintiff amended her complaint and added a claim for violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA"). (Doc. 30.) After Plaintiff filed this suit and requested documents in discovery, Plaintiff found that SunTrust had applied a monthly payment that Plaintiff made on March 31, 2017 as a principal reduction payment rather than a regular payment. (Doc. 39, Attach. 4 at 34.)

## STANDARD OF REVIEW

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citing Fed. R. Civ. P. 56 advisory committee notes). Summary

14

judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will

not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

**ANALYSIS**

I.   PLAINIFF'S FDCPA CLAIMS

   A. Alleged Violation of 15 U.S.C. § 1692f by "attempting to collect amounts not authorized by agreement"

Defendant SLS contends that Plaintiff fails to state a claim for her FDCPA claim premised on 15 U.S.C. § 1692f because she fails to identify in the complaint any amount that Defendant SLS has attempted to collect without such authorization. (Doc. 37, Attach. 1 at 12.) Defendant SLS also argues that, because the alleged error arose before Defendant SLS began servicing the loan, the one-year statute of limitations under 15 U.S.C. § 1692k(d) bars the claim. (Id. at 12-13.) Finally, Defendant SLS contends that "in notifying [Plaintiff] of the default, SLS was relying on the information that SunTrust had provided regarding the amount of debt and was not obligated to undertake an investigation regarding the validity of the debt before undertaking collection." (Id. at 13.) Specifically, Defendant SLS argues that because it relied on the information from SunTrust and Plaintiff did not dispute the debt

in writing within thirty days, any violation was not intentional and resulted from a bona fide error. (Id. at 14.) In response, Plaintiff argues that the statute of limitations does not bar the claim as each time Defendant SLS sought to collect the debt, a new violation occurred and that Defendant SLS is not entitled to the bona fide error defense in these circumstances. (Doc. 39 at 11.)

First, as to the statute of limitations argument, the Court finds that Plaintiff's claims, to the extent that they arose within one year of filing her complaint, are not time barred. Although there is not binding caselaw from the United States Court of Appeals for the Eleventh Circuit on this issue, district courts in the circuit have found that, where there are numerous communications, some of which fall outside the statutorily permitted time period, the plaintiff may maintain those claims based on the communications that were not time barred even if the communications concern the same debt. Kaplan v. Assetcare, Inc., 88 F. Supp. 2d 1355, 1360 (S.D. Fla. 2000); McCorriston v. L.W.T., Inc., 536 F. Supp. 2d 1268, 1272 (M.D. Fla. 2008). Additionally, other circuits have considered this issue and have found that subsequent communications can create separate causes of action. Purnell v. Arrow Fin. Servs., LLC, 303 F. App'x 297, 301 (6th Cir. 2008); Solomon v. HSBC Mortg. Corp., 395 F. App'x 494, 497 (10th Cir. 2010) ("Thus, separate communications can create separate causes of action arising from collection of a single debt.");

17

Demarais v. Gurstel Chargo, P.A., 869 F.3d 685, 694 (8th Cir. 2017) (stating that an individual may sue to enforce FDCPA liability within one year of the violation and that "[i]t does not matter that the debt collector's violation restates earlier assertions—if the plaintiff sues within one year of the violation, it is not barred by § 1692k(d)"). Thus, to the extent that these violations are alleged to have occurred outside the limitations period, they are barred by the statute of limitations. However, as to all communications of the alleged debt and delinquency that was communicated by Defendant SLS to Plaintiff within one year of her filing her complaint, these claims are not time-barred.

Next, as to Defendant SLS's contention that the bona fide error doctrine protects it from liability, the Court finds that Defendant SLS has not carried its burden to establish the affirmative defense.

15 U.S.C. § 1692k(c) provides that:

> [a] debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

This defense is an affirmative defense and the debt collector bears the burden of proof. Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1271 (11th Cir. 2011). Thus, a debt collector must show "that its FDCPA violation (1) was not intentional; (2) was a bona fide error; and

18

(3) occurred despite the maintenance of procedures reasonably adapted to avoid any such error." Id. (internal quotation marks and citation omitted).

Defendant SLS cites to Hyman v. Tate, 362 F.3d 965, 968 (7th Cir. 2004), and argues that in notifying Plaintiff of the default it was relying on SunTrust's information and was not required to undertake an investigation before beginning collection. (Doc. 37, Attach. 1 at 13.) In response, Plaintiff argues that Hyman is inapplicable because Defendant SLS did not cease its unauthorized collection activities after it was informed of an error and that Defendant SLS has offered no evidence that it maintained or followed any procedures designed to investigate or correct the error. (Doc. 39 at 13.) Defendant SLS argues that Plaintiff, however, still fails to identify any authorized amount that Defendant SLS attempted to collect as a result of the alleged error. (Doc. 40 at 11.)

First, the Court notes that Defendant SLS actually stated in its reply brief that "[n]or does [Plaintiff] specifically identify in her Response any amount she contends SLS attempted to collect without authorization other than $2,799.16 which she acknowledges was referenced in the letter" sent by Defendant SLS to Plaintiff on June 22, 2017. (Doc. 40 at 9.) Thus, it appears that Defendant admits that Plaintiff has shown the amount she contends was unlawfully being collected. Further, although the June 22, 2017

19

letter is barred by the statute of limitations, as discussed above, Plaintiff has shown that Defendant SLS continued to mail her monthly statements and in each statement, Defendant SLS reported Plaintiff's balance as being delinquent all based on the same error carried over from SunTrust. (Doc. 42 at 7.)

"[T]he FDCPA does not require debt collectors to independently investigate and verify the validity of a debt to qualify for the bona fide error defense." Owen, 629 F.3d at 1276 (citing 15 U.S.C. § 1692k(c); Hyman, 362 F.3d at 968). However, "the debt collector has an affirmative statutory obligation to maintain procedures reasonably adapted to avoid readily discoverable errors." Id. The question thus becomes whether Defendant SLS has shown that it maintained procedures to avoid a readily discoverable error such as misreporting a payment and reporting a loan to be delinquent. Defendant SLS has not supported its burden on the bona fide error affirmative defense at this time. In Owen, the Eleventh Circuit found that the debt collector's procedures, as presented in the record, were not sufficient under the third prong of the bona fide error defense because the debt collector "cited no internal controls it employs to reduce the incidence of improper debt collection. Rather, [the debt collector's] procedure is to outsource its oversight task to its creditor AAA, which must report only debts that are 'validly due and owing.' " 629 F.3d at 1276. Similarly, Defendant SLS did not

20

argue or cite to any evidence regarding its policies, procedures, or practices that reduce the occurrences of misapplied payment errors.[5] Accordingly, the Court **DENIES** Defendant SLS's Motion for Summary Judgment (Doc. 37) as to Plaintiff's 15 U.S.C. § 1692f claim premised on Defendant's alleged attempts to collect amounts not authorized by agreement.

B. Alleged Violation of 15 U.S.C. § 1692f by "taking nonjudicial action to affect [sic] dispossession or disablement of the Property without a present right to such possession"

Defendant SLS contends that Plaintiff cannot show that it violated the FDCPA by "taking nonjudicial action to affect dispossession or disablement of the Property without a present right to such possession" because the evidence demonstrates that Defendant SLS did not change the locks. (Doc. 37, Attach. 1 at 14.) Specifically, Defendant SLS points to its records and the records of Servicelink to show that the first date that the Property was secured was in 2018. Second, Defendant SLS contends that even if it had changed the locks, it was authorized to secure the Property and cannot be held liable. (Id. at 15.) In response,

---

[5] Cynthia Wallace stated in her declaration that SLS maintains reasonable preventative measures to avoid violations of debt collection laws and that these policies and procedures "include relying upon account information provided by a prior servicer when servicing is transferred and notifying borrowers of their rights to dispute the validity of the debt." (Doc. 37, Attach. 3 at 4.) This is effectively the same as the purported policy rejected in Owen that requires more than merely outsourcing its oversight task.

Plaintiff argues that there is ample evidence from which a jury could conclude that Defendant SLS directed the locks on the Property to be changed. (Doc. 39 at 15.)

While the Court accepts Plaintiff's version of events and credits her testimony that she was locked out of the Property on August 25, 2017, there is no evidence supporting her claim that the lock change was done by Defendant SLS or at the request of Defendant SLS. The evidence shows that Defendant SLS did not authorize the Property to be secured until January 18, 2018. (Doc. 39, Attach. 2 at 150.) As Plaintiff's counsel noted during the deposition of Loretta Poch, Defendant SLS was not in possession of ServiceLink's report from the inspection on August 25, 2017 when Property Preservation informed Matthew Stewart that it had not secured the Property. Thus, even assuming that ServiceLink secured the Property on August 25, 2017, it was not at the request or direction of Defendant SLS because, to Defendant SLS's knowledge on the same day, no request to secure the Property had been approved or ordered. This is also supported by Defendant SLS's internal records in which it did not tell ServiceLink to "proceed as normal" if the Property was vacant until August 29, 2017, **after** it received the August 25, 2017 inspection report, and did not authorize the work of an initial grass cut until August 31, 2017. (Doc. 39, Attach. 2 at 145.) Moreover, as Plaintiff states in her opposition brief, "SLS concedes that it has no record of whether

it directly approved or denied ServiceLink's lock change request or whether ServiceLink acted without awaiting a response." (Doc. 39 at 5.) Thus, Plaintiff concedes that there is no evidence that Defendant SLS directed ServiceLink to secure the Property before January 18, 2018.

Additionally, assuming that ServiceLink did in fact change the locks on August 25, 2017, Plaintiff has not argued or cited law as to how Defendant SLS would be liable for the unauthorized actions of ServiceLink. Plaintiff does briefly cite to O.C.G.A. § 10-6-61, which provides that a "principal shall not be liable for the willful trespass of his agent unless done by his command or assented to by him" and cites to Aviles v. Wayside Auto Body, Inc., 49 F. Supp. 3d 216, 226 (D. Conn. 2014). (Doc. 39 at 15.) As stated above, however, there is no evidence that Defendant SLS consented to changing the locks or otherwise securing the Property on August 25, 2017. Additionally, in Aviles, the district court stated that "[i]t is also undisputed that pursuant to the [Repossession Services Agreement between Wayside and Wells Fargo], Wayside was entitled to act on behalf of Wells Fargo in taking possession of the Honda." 49 F. Supp.3d at 226. Here, it is very much disputed that Defendant SLS ever authorized the Property's locks being changed. The Court has no other evidence before it regarding any kind of agency relationship between Defendant SLS

23

and ServiceLink and, therefore, cannot find that Defendant SLS can be held liable for any unauthorized actions taken by ServiceLink.

With respect to the calls Plaintiff and Plaintiff's counsel had with representatives of Defendant SLS, Plaintiff seems to argue that these are statements in which Defendant SLS admits, through its employees, that it had indeed changed the locks in August 2017. However, from the facts outlined above, what is clear is that there was a lack or breakdown of prompt communication within Defendant SLS. At the time that Villegas-Heras relayed that Plaintiff's counsel would receive keys in a few days, she had been told by #NA SLS PropPres that ServiceLink would be contacted to send the keys. The next day, on December 20, 2017, #NA SLS PropPres was notified by ServiceLink that it did not secure the Property and had no keys to provide. (Doc. 39, Attach. 2 at 170.) However, from the evidence before the Court, #NA SLS PropPres did not communicate this fact to Villegas-Heras and Tatum Flor until December 29, 2017—after Plaintiff's counsel was told to expect keys to be delivered. (Id. at 173.) The same appears true for the letter dated January 5, 2018. The letter repeats that there had been an internal approval to mail the keys dated December 19, 2017. While Defendant SLS represented that keys had been ordered to be mailed to Evans, each communication of this fact appears to rest on the initial request to ServiceLink on December 19, 2017.

24

The Court does commiserate with Plaintiff's frustration in being locked out of the Property, however, the evidence in this case does not show that it was ordered or authorized by Defendant SLS. Accordingly, the Court **GRANTS** Defendant SLS's Motion for Summary Judgment (Doc. 37) as to Plaintiff's 15 U.S.C. § 1692f claim premised on Defendant's alleged actions of taking nonjudicial action to affect dispossession.

C. Alleged Violation of 15 U.S.C. § 1692e by "communicating to credit reporting agencies credit information concerning Plaintiff that Defendant knew to be false at the time of reporting"

Defendant moves for summary judgment on Plaintiff's 15 U.S.C. § 1692e claim on the basis that Plaintiff fails to identify any alleged false credit information and fails to allege when Defendant SLS communicated any such information. (Doc. 37, Attach. 1 at 17.) Additionally, Defendant argues that, to the extent Plaintiff is basing her claim off the misapplied payment by SunTrust, it cannot be held liable because there is no evidence that Defendant SLS knowingly reported any false information because it relied on SunTrust's information and because Plaintiff did not dispute the debt in writing. (Id.) Plaintiff argues that her claim survives summary judgment because she put Defendant SLS on notice that the information was false by telling Defendant SLS that SunTrust had misapplied a payment and Defendant SLS agreed to investigate. (Doc. 39 at 20.) Plaintiff also argues that there is no requirement under

15 U.S.C. § 1692e(8) that she had to dispute the debt in writing. (Id.)

15 U.S.C. § 1692e(8) states that "communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed" is a violation of the FDCPA. Plaintiff communicated to Defendant SLS that she was disputing that she was delinquent on her loan and was told by Defendant SLS that it would investigate. (Doc. 39, Attach. 3 at 0:00-2:50, 17:55-17:60, 21:00-22:50, 38:19-39:12.) The " 'knows or should know' standard of § 1692e(8) 'requires no notification by the consumer . . . and instead, depends solely on the debt collector's knowledge that a debt is disputed, regardless of how that knowledge is acquired.' " Evans v. Portfolio Recovery Assocs., LLC, 889 F.3d 337, 347 (7th Cir. 2018) (quoting Brady v. Credit Recovery Co., Inc., 160 F.3d 64, 67 (1st Cir. 1998)).

Here, Plaintiff cites to evidence in which she informed Defendant SLS that the delinquency was in error as early as July 2017 (Doc. 39, Attach. 3 at 0:00-2:50, 17:55-17:60, 21:00-22:50, 38:19-39:12) and to evidence that Defendant SLS subsequently reported her account as delinquent to credit reporting agencies beginning in October 2017 (Doc. 39, Attach. 4 at 152:16-156:4). Thus, Defendant SLS was informed by the consumer that she was disputing the debt and even verbally promised to undertake an

investigation. Plaintiff has thus shown that there exists a genuine issue of material fact as to whether Defendant SLS violated section 1692e.

Further, Defendant SLS's defense that it cannot be liable under 15 U.S.C. § 1692e because Plaintiff failed to dispute the debt in writing is unavailing. Although the Court has not found any binding caselaw in the Eleventh Circuit, numerous other circuit courts of appeals have found that the phrase "disputed debt" in 15 U.S.C. § 1692(g), which specifies that the consumer must notify the debt collector in writing, applies only to that section and does not extend to 15 U.S.C. § 1692e(8). Evans, 889 F.3d at 347; Sayles v. Advanced Recovery Sys., Inc., 865 F.3d 246, 250 (5th Cir. 2017); Russell v. Absolute Collection Servs., Inc., 763 F.3d 385, 392 (4th Cir. 2014) ("We therefore hold that a debtor is not required to dispute his or her debt pursuant to § 1692g as a condition to filing suit under § 1692e."); Brady, 160 F.3d at 67. Likewise, the Eleventh Circuit Court of Appeals noted in Hepsen v. Resurgent Capital Servs., LP, 383 F. App'x 877, 882 (11th Cir. 2010), that section 1692g and section 1692e operate independently of one another. Specifically, the Eleventh Circuit stated that

> § 1692g(b) does not modify the previous section of the FDCPA, § 1692e, prohibiting a debt collector from attempting to collect an inaccurate debt, so [the debt collection agency] still could be liable for sending the demand letter to [the plaintiff] even if the FDCPA does not explicitly require that [the debt collection agency] verify the debt before sending a demand.

27

Hepsen, 383 F. App'x at 882. Accordingly, the Court **DENIES**
Defendant's motion for summary judgment as to Plaintiff's claims
based on 15 U.S.C. § 1692e.

II.   PLAINTIFF'S STATE LAW CLAIMS

    Defendant SLS seeks summary judgment on all of Plaintiff's
state law claims and rests on its arguments that the security deed
and Georgia law allow a lender to secure a vacant property
following a borrower's default. (Doc. 37, Attach. 1 at 18.) In
response, Plaintiff states that she incorporates her opposition
arguments and that the evidence reveals that SLS's conduct was
unlawful in numerous respects. (Doc. 39 at 21.)

    In her complaint, Plaintiff brought state law claims for
trespass to land, negligence, interference with enjoyment,
conversion/deprivation of personal property, trespass to
personalty, and attorneys' fees. (Id. at 8-12.) These claims are
premised upon Defendant entering the Property, changing the locks,
and destroying the improvements Plaintiff had of the original
locks. (Id.) As stated above, the evidence does not support a
finding that Defendant SLS approved or ordered ServiceLink or any
other company to secure the Property and change the locks. Further,
as stated above, Plaintiff has not cited to law that would hold
Defendant SLS liable for any unauthorized actions of ServiceLink.

28

Accordingly, the Court **GRANTS** Defendant SLS's Motion for Summary Judgment as to Plaintiff's state law claims.

III.   PLAINTIFF'S RESPA CLAIMS

Defendant argues that Plaintiff's RESPA claims fail because it did not receive Plaintiff's qualified written request ("QWR") at the address it designated to receive such communications. (Doc. 37, Attach. 1 at 19.) Defendant contends that a lender or servicer's obligations under RESPA arise only when it receives a QWR. Defendant then argues that, because Plaintiff's alleged QWR was not sent to Defendant SLS's designated QWR address, it does not qualify as a QWR. (Id. at 20.) In response, Plaintiff argues that Defendant SLS's argument fails because Defendant admits to receiving the QWRs and responding to them. (Doc. 39 at 21.)

When a borrower submits a QWR "the servicer must provide 'a written response acknowledging receipt of the correspondence' and take certain other responsive actions within specified time periods." Bivens v. Bank of Am., N.A., 868 F.3d 915, 918 (11th Cir. 2017) (quoting 12 U.S.C. § 2605(e)(1)(A), (e)(1)(B), (e)(2)). The Eleventh Circuit Court of Appeals has held that, under RESPA, "[i]f a servicer designates a particular address for receiving QWRs, Regulation X requires a borrower to mail a QWR to that address to trigger the servicer's duty to respond." Id. at 919.

In this case, Plaintiff's attorney, Larry Evans, mailed two letters, dated December 7, 2017 and December 20, 2017, to Defendant

SLS at the address of "P.O. Box 636005, Littleton, CO 80163." (Doc. 37, Attach. 5 at 118-24.) While the Notice of Servicing Transfer dated May 31, 2017 stated the address for QWRs to be "P.O. Box 636005" (Doc. 37, Attach. 4 at 40), Plaintiff received numerous later communications from Defendant SLS in which the address for sending QWRs was specified to be "P.O. Box 630147," including monthly mortgage loan statements in June, July, August, September, October, and November 2017 (Doc. 37, Attach. 3 at 85-91; Doc. 37, Attach. 3 at 51-62, 95-96). The evidence shows that Plaintiff did not submit the letters to the QWR designated address, and accordingly, Defendant SLS had no duty under RESPA in responding to those letters.[6] Accordingly, Defendant SLS's Motion for Summary Judgment (Doc. 37) as to Plaintiff's RESPA claims is **GRANTED**.[7]

---

[6] Plaintiff argues that Bivens does not stand for the proposition that where a servicer actually responds to a QWR, whether or not it was sent to the designated address, the servicer is still bound by RESPA. (Doc. 42 at 8.) However, Bivens encountered this exact factual scenario. The plaintiff in Bivens mailed a letter to the loan servicer and the servicer responded with two letters, one of which informed him that he mailed his letter to the wrong address. 868 F.3d at 918. The servicer did not timely provide the plaintiff with the document he requested and the plaintiff sued the servicer in district court "based upon [the servicer]'s failure to provide an appropriate response." Id. As discussed, the Eleventh Circuit affirmed the district court's grant of summary judgment to the servicer and found that the servicer owed no obligations under RESPA because the letter was not mailed to the QWR designated address. Id. at 921.
[7] Because this Court finds that Defendant SLS had no obligation to respond to the letters, the Court need not consider the additional arguments advanced by Defendant SLS.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 37) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's 15 U.S.C. § 1692f claim premised on Defendant's alleged attempts to collect amounts not authorized by agreement and Plaintiff's 15 U.S.C. § 1692e claims remain.

SO ORDERED this 28th day of May 2020.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA